Come on up, take your time to set up, but I'll go ahead and call the next case. And that is 20-13444, Sailboat Ben Silver Living et al, versus the City of Fort Lauderdale. Mr. Poland. Good morning, Your Honors. Good morning. May it please the Court, Mr. Gill. So, Congress, in amending the Fair Housing Act in 1988, sought to prohibit code enforcement activities or legislative activities that has the effect of making housing unavailable to groups of, in this case, recovering addicts and alcoholics, which was one of the newly created protected classes in 1988. The City of Fort Lauderdale, in 2018, enacted a ordinance that was designed to not only regulate sober housing, but to ostensibly reduce the number of sober housing that could be established in the City of Fort Lauderdale. The ordinance was explicit in the classification of this protected class. It was directed solely at what they called, what they designated as community residences, which were sober living residents. Now, the court below rejected our facial challenge saying, the ordinance benefits the disabled, benefits addicts and alcoholics, because you can have four or more, more than four, up to ten, in any residential zone in the city. And our response was, but there are conditions. And there are no cases with that fact pattern, right? We're not aware of any, Your Honor. Because like the district court said, on the one hand, you are getting the possibility of getting your foot in the door and getting treatment that other entities do not get. But in order to get that more favored treatment or more broad treatment, you have to satisfy certain conditions. How do you treat that sort of a statute? Well, the Sixth Circuit, in a case called MX Systems versus City of Covington, dealing with a methadone clinic, it was a methadone stat ordinance that had a spacing requirement in it, said that was a facially discriminatory ordinance. And MX had made a reasonable accommodation request to carve out the spacing requirement. And the Sixth Circuit, which I think was adopted by a couple of other circuits, said if it's a facially discriminatory reasonable accommodation, it's not going to cure the discriminatory features of the statute. But this statute is not a reasonable accommodation scenario in that way. In that case, what happened was you had the spacing requirement, which treated the disabled, for lack of a better term, differently. So it was discriminatory. And then there was an attempt to request reasonable accommodation. Here, you're treated a little bit better if you have a home for the disabled in this sort of sense. But then you have to meet certain criteria. That's the problem, is the criteria. So it depends on the criteria. If the criteria are easy to satisfy, then it's not facially discriminatory. If the criteria are difficult to satisfy, then it is facially discriminatory? It's not a matter of difficulty, Your Honor. And what does it depend on? It's a matter of plain terms of the conditions. If the condition merely said, you have to submit an application 120 days in advance to be better treated, would that be facially discriminatory? That would not. Why not? Because it has nothing to do with making housing unavailable. It is the terms of the ordinance where it says, you have to submit a conditional use permit, and if you're within 1,000 feet of another sober living facility, then you have to go apply for reasonable accommodation. It is that spacing requirement that is the discriminatory feature of the ordinance. It is discriminatory in the terms and conditions of making that application. It's not. If a group of six college students wanted to rent a single-family dwelling in whatever zone in the city of Fort Lauderdale, all they would have to do would be submit that conditional use permit. They don't have to comply with this 1,000-foot spacing requirement. I guess this is perhaps where I'm confused, and you can help me. I understood the ordinance in substance to say the following. Three or more unrelated, non-disabled people cannot live together in a residential district. If a fraternity wanted to open up a fraternity house in a residential district, by the terms of the ordinance, they could not. On the other hand, three or more disabled people could, under certain circumstances with certain limitations, live within a residential district. If I have that right, and if I don't, please explain it to me. If I have it right, it seems to me that three or more disabled people are not discriminated against but rather are favored when compared to the proper comparator, which would be three or more non-related, non-disabled people. Do I have the statute wrong? Have I misunderstood that? That is what the parameters of the statute is, Your Honor. However, I would submit to the court that the three or more unrelated, non-disabled persons, if they wanted to reside in a residential zone, would still have to apply for a zoning permit. And if they apply for that zoning permit, they would not be required to comply with the conditions of the ordinance. Yes, and I'm not understanding the statute, and you can help me with it. There's a fraternity near a college in the city of Fort Lauderdale. There are 30 members of the fraternity, or it could be a sorority. They want to live together in a residential zone. Can they do that pursuant to this ordinance? I thought they couldn't. I don't think they can because we're talking about 30 people as opposed to groups of 4 to 10. Well, then just use 10. So let's suppose it's 10. Are you telling me that under this ordinance- They would not have a right. 10 fraternity brothers could live together within the residential area if they were unrelated and non-disabled? They would not have a right to do so. They would have to go through a zoning process. Whereas 3 or more disabled people could live together within the area so long as they met the other conditions of 1,000 feet from some other facility. If that's so, it just struck me that the disabled were treated more favorably than the non-disabled. Have I misunderstood that? The fact that there are additional conditions on them is true, but with regard to the non-disabled, they can't do it at all. The non-disabled can do so subject to zoning approval if they so desire. The problem here- They have to get a variance. Right. It's a zoning approval. Whereas the disabled do not have to go to zoning and do not have to get a variance. All they have to do is establish that they're not living within 1,000 feet of another similar dwelling, right? However, if they want- Do I have that right? If they wanted a particular dwelling- But I just want to know, do I have that right? That is what the statute says. However, if they want a particular dwelling, and this is what the Fair Housing Act allows them to do, is to occupy a dwelling of their choice, then they are subject to the condition- If they say, we want that house across the street, the city says, but there's another sober living house two blocks away. It's within 1,000 feet, within this radius. You're going to have to apply for a conditional use permit. Not only are you going to have to apply for a conditional use permit, you're now going to have to demonstrate that you're not going to interfere with the fabric of the neighborhood, that you're going to fit into the neighborhood. You're going to have to apply for reasonable accommodation, and in that reasonable accommodation application, you're going to have to prove a negative. You're going to have to prove that your request does not cause a fundamental alteration to the city's zoning scheme. Let me ask a clarifying question, because I just want to make sure I understand. If the disabled residents decide not to proceed under the ordinance, but they instead go for a conditional use permit, just as the fraternity would do, in Judge Marcus's example, is it a different process, or is it exactly the same? Well- Would they have to meet different conditions going that route, as opposed to going through the ordinance? Disabled have to meet certain conditions that were specified in the creation of this ordinance. It isn't just that you meet whatever the zoning criteria is. There are specific criteria based on the specific characteristics of addicts and alcoholics. One of them is that you're not going to create a mini-institution or a de facto social services district. Another one is that you have to certify or demonstrate that you're going to fit within the fabric of the neighborhood and not interfere with the neighborhood. Another one is that you're going to have to demonstrate that the accommodation that you are seeking will- and there's a specific term here- actually alleviates the disability, which is a wrinkle on the Treasure Island case where it says all that is necessary for the accommodation is that it ameliorates. It doesn't say actually alleviates. It says it ameliorates. It's almost impossible to say that living together in a sober living setting is going to have 100% efficacy, meaning that there's going to be- if it says it actually alleviates, I think that the inference is that there's going to be 100% sobriety, and that just doesn't hold true. I see I'm out of time, and I've reserved- Mr. Gill. Good morning, Your Honors. Hudson Gill on behalf of the City of Fort Lauderdale. May it please the Court. Respectfully, I think my opposing counsel has misstated how the ordinance works. Just to be clear, when they adopted this ordinance, they basically said, first, we're going to say if you are three or less unrelated persons, whether you're disabled or not, you are treated just like a family, so you're allowed as of right in any zoning district where residential properties are permitted. You don't have to register. You don't have to do anything. Then, with respect to unrelated persons between four and ten, if you are non-disabled, you're not allowed in any residential zoning districts. Can I ask you a wrinkle on that? It may not be relevant, but I'm trying to- like Judge Marcus, I'm trying to wrap my head around how the scheme works. Sure. The number of related unrelated is in the aggregate. For example, if you have four family members and one non-family member, how is that group of five treated? I have to pull up the definition to look at it. That did not really come up. No, I know. I'm just trying to figure out how the scheme defines and classifies at the outset. I'll pull up the definition, Your Honor, so I don't misspeak. The way it defines a family is one or more persons living together and interrelated by bonds of co-sanguinity, marriage, or legal adoption, or a group of persons up to three in number who are not so interrelated occupying the whole part of a dwelling. So it really seems to be either or is how it's defined. But once you go over the four,  Now, the ordinance itself doesn't even provide a mechanism for them to appeal that and seek some type of variance. Now, our zoning code does have a variance in general. You can seek a general variance. True. But what they've done here is they've said with respect to unrelated disabled persons between four and ten, you're permitted as of right in certain residential zoning districts depending on, number one, how your tenancies work. So they say if you're what they call a family community residence, which means your tenancies are years, you're basically entitled as of right in any residential zoning district so long as you meet the 1,000-foot separation requirement. And that's really the only criteria there. But it seems to me that the hard question, at least, and I speak only for myself, the hard question on the facial discrimination claim, the first claim, is whether or not the conditions placed upon the three or more disabled, non-related people are so onerous that the initial favorable treatment at the top end is really just illusory. Because if you said, okay, if you have three or more and they're disabled, then you can be in a residential area as long as you meet these conditions. Condition number one is that you put up a $5 million nonrefundable bond and we can keep it forever. We don't have to pay you interest on it or anything, but you've got to put that money in there. And, you know, it lays out 30 criteria that are just so impossible to meet that, you know, the favorable treatment at the front end is just illusory. So help me with that. And, again, this is only my concern. I'm not speaking for Judge Marcus. The criteria really is a 1,000-foot separation criteria, and that's not onerous. I mean, it's simply a matter of where your property is located. So if no one else is 1,000 feet, you get to be there as of right. So someone will meet that. There will be a certain number that will automatically meet that. It's not as if, you know, $5 million where no sober house is going to be able to come up with that type of cash. I mean, it's merely a product of where you've located your property. Number two, when they adopted the rules. Let me just stop you at that point, if I could, to follow up on Judge Jordan's question. Suppose instead of saying 1,000 feet, it said 5 miles or 10 miles. Then you might have the very problem that Judge Jordan is raising, wouldn't you? That it would appear to be, while on its face, they're treated better than the non-disabled. Effectively, they've given it with the left hand and taken it away with the right, so they've given them nothing and they're on equal footing. True. I agree with that. You could create conditions that are so onerous that, you know, if the separation requirement is bigger than the jurisdiction, yeah, you're not going to allow any zoning. So your position, if I have it right, is that they were treated, the disabled, a whole lot better than the non-disabled because they had a reasonable probability of being allowed to live in a residential area. So long as it was 1,000 feet from, let's say, three and a half, four city blocks, from another such facility. Whereas if they were not disabled, they're not in no-how, no-way period, unless they go through an alternate process seeking a zoning variance, right? Correct. And also, just to add on to that, I mean the ordinance itself built in a grandfathering provision for existing recovery residences. So when the ordinance was adopted, if you were already existing and you were within 1,000 feet, you got to exist where you were without having to, you know, deal with that issue and go through the process. Let me ask you this question. Assume for the purposes of my question that facially, the disabled are treated more favorably than the non-disabled. How do we address it sort of in terms of the kind of test or tests that we ought to fashion here? Well, I think the district court discussed that a little bit in its opinion. Discussed it a whole lot. I'm sorry. He discussed it a lot. I mean, one way to do it is simply to say there's no discrimination against the disabled, which is what the statute requires because they were not only not treated worse than the non-disabled, they weren't treated the same, they were treated arguably better. Does the case end there? Well, I think, Judge, I don't think there's an answer to there on a case that says that. But if you look at the two-part test that the court employed and that most courts have employed, if you first look whether there's some sort of facial difference in how they're treated, and then you go to step two, which whether it's justified, one of the analysis is does it benefit them? No, that's really getting at the heart of my question. And I'm missing something here because I've read these cases, and I don't understand why you'd get to the second step. If disabled folks are treated better than non-disabled folks, if they're not discriminated against on account of disability, why would I ever get to the second question of whether there was a justification for it? It seems to me I would only ask the question of justification if they were here's why we had to do it for reasons of safety or something like that. But why would I get to the second step if they're treated facially more favorably than the non-disabled? Well, our position would be you really wouldn't need to go to the second step because, again, on its face, the ordinance doesn't discriminate. It provides them more rights. It provides them beneficial treatment. So you wouldn't need to get to that. Now, below, we argued both points because we wanted to. Right. But here's what I'm not getting. But every time I read these cases, they seem to go to the second step. The district judge here, Judge Altman, did. He went to the second step and said they were treated more favorably. They weren't discriminated against on account of disability. Therefore, on step two, you get summary judgment. I'm simply trying to understand why I would get to the second prong or step at all. It seems to me that's the same question being asked, whether you call it step one, step two, are they treated better or are they discriminated against? Isn't that the same question, whether you ask it around one around two? That was my point. It is the same question. So I think courts do it. District courts, probably just because it seems to be the safest route to take or you do the both analysis. But yes, it's the same analysis with respect to our ordinance. The reason it's justified is because it treats them better. So if you look at that in step one, you don't really need to go to step two. Thank you. I have a question about the, about the test that the sixth and ninth circuit have applied and it doesn't, I don't think it comes into play in this case, but I'm just curious when the test says refers to safety concerns raised by the individuals affected, are the individuals affected the persons who are allegedly discriminated against, or could that be the public at large? How have the, how has that test been applied? I understand that to be the public at large. And that's typically what it looks like, that the person's affected, I guess would be the surrounding properties or the other properties affected is how I understood that. Because I mean, some of the courts have even gone farther and said, you know, legitimate, you know, the resident character of residential neighborhoods. I think the district court in a, in the Boca Raton case looked at that as a potential consideration also. So I interpreted that to be to look at, you know, the effect of the surrounding properties. Thank you. Just to follow up on my colleague's question, would you ever get to that second step? If they're treated more favorably, would you ever ask whether there are safety reasons or whatever? Or would you only ask that question if they were treated less favorably? I believe you would only ask that question if they're treated less favorably. Thank you. And obviously there, there were two more counts that are on appeal today. And I just like to touch on those briefly. There was the reasonable accommodation claim and, you know, there the district court found, although he went through an analysis of whether the request was reasonable, he ultimately only ruled upon the necessity of it. And we think that should be affirmed. This court in Shaw addressed a similar type case where it was dealing with financial conditions. And this court instructed the kind of things you look at with respect to whether a financial condition is necessary. And what we say here, judges, the request they were asking for to not have to really put in a sprinkler system under the fire code, wasn't necessary to alleviate the impact of the disability for a couple reasons. Number one, they didn't really argue that even below they didn't present evidence to show that, that these disabled persons could not pay because they were disabled. So they didn't even make the necessary argument to get there. On appeal, they've cited an affidavit of a single tenant who said, you know, he probably wouldn't be able to pay a higher rent. And there's two problems with that. Number one, I don't think that evidence gets them far enough to show that because of the disability, he couldn't pay the rent. But number two, he's only a single tenant in this property. He's not even one of the plaintiffs. The plaintiffs here are a, a for-profit corporation and the property owners. Now they have the right to assert rights under the fair housing act. But if you're looking at necessity, I think that comes into play with, with who is the party seeking that accommodation based on financial conditions. Because in this case, the evidence was undisputed that these plaintiffs already intended to increase the rent or their tenants and still cater to disabled persons. But, but part of their argument is not, and I take your position about the financial issues, but part of their point is that given the nature of the disability in this case, you don't really need the sprinkler systems because these people are able to function and take care of themselves and the like in the way that, for example, a family of seven might be able to take care of themselves. So that's not the whole argument, but it's part of the argument. It doesn't go to the financial issue. That goes to the reasonableness of the request. That is a separate element under the reasonable accommodation request. When you look at necessity, that does look at the financial component and that's because what they're seeking is they're saying it's too expensive to put this in. They're also saying. But necessity goes on, on which side of the ledger, their side or your side? I'm sorry. Necessity goes on whose side of the ledger, their side or your side. So they have to show it's, it's the necessity is, is they have to establish that they need this accommodation due to their disability. It's got to alleviate the impact of the disability. And what this court's instructed with respect to financial disabilities. I mean, the Shaw case laid out what the test is and it said, you know, you have to show that the disability there, it was quadriplegia and here it's, it's a addiction creates the inability to work and thus the need for the waiver of the financial condition. Cause that's really what this was about a financial condition. They want to not comply. Let me, let me ask you quickly cause your time is finishing. What about the accommodation claim based on the maximum number of unrelated persons who could live together? That's different, right? In kind, I don't, I mean, they, they argue, they argue in their brief that one of the accommodations requested and denied was with respect to the number of persons. Well, that, that it's not simply the number of persons because under the, with respect to the as applied claim, and this is the fire code, we never said they couldn't operate a sober home at this location. They've always been able to do that. If they had more than three unrelated individuals, the fire code then says, okay, you are now not a single family residence. You're something else. And the fire code applies and therefore you have to really, there's other requirements, but the big one was put in a sprinkler system. So that's what the number was. It wasn't a cap saying you can't operate there. It's simply saying the cap was, if you're above the cap, you have to comply with the sprinkler system. You're saying that by requesting a reasonable accommodation on the, on the cap, they're really requesting a reasonable accommodation on all of the other requirements that fall into place. Once you exceed the cap. Of the fire code. Exactly. That's exactly. Including the fire code. The fire code was the key thing that the issue was. Okay. And I see that my time is up. So I will rest on my papers for the rest of my arguments and ask that the judge's ruling be affirmed. Thank you very much, Mr.  Thank you, Your Honor. Thank you. I want to address the questions that judge Marcus raised. You get the step there. If we make out a prima facie case. That the ordinance is facially. Discriminatory. Then you go to step two. We. And. But, but if. You don't. Facially succeed in that regard. There would be no reason to go to step two. You would agree with that. Theoretically. Then we would probably go as an, on an applied theory, but in this case, in this case, there was no, your claim is a purely facial claim. Early facial. The court, the district court accepted. That the, that the ordinance was facially discriminatory and then went to the analysis. Adopting the, the, the ninth and the sixth circuit. Right. My, my question simply was, though, if one were to conclude and it just struck me reading the ordinance. That it would be proper to conclude that there was no. Discrimination against the disabled in the ordinance because they were treated more favorably. Then a similarly situated non disabled group of people. If that's so. Then there would be no need to address justification.  I think I don't, I don't believe that's correct. Your honor. I think if, if the terms of the ordinance are explicit in, in, in who, who it is, what group it attempts to regulate. Then I understand you to be saying. That on the face of the ordinance, the disabled were discriminated against. I understand the argument you make, but I'm asking you a different question. I want you just to assume for the purpose of my question. That the ordinance does not discriminate against the disabled on its face. If that were so one would have no need to get to the second step. Do you agree with that? If it did not, yes, I'm asking the question. If it did not hypothetically speaking, if it did not, then you would not have to get to justification. You would, you wouldn't, you wouldn't employ a different analysis to determine whether or not the, the, the ordinance discriminated against the disabled. All right. Could you tell me then simply put, how does the face of this ordinance treat the disabled less favorably than the non-disabled? It has a housing quota in it. This spacing requirement is a housing quota. All right. Once, once a community says you can only establish a certain type of residence within a thousand feet of each other, it's a housing quota, which means at some point available housing will no longer be available. Housing. Mr. Paul, let me, let me stop you. Let's assume that the scheme did not have this possibility for sober living facilities to be placed in residential areas. So the city of Fort Lauderdale scheme simply said, if you have more than three people who are unrelated, you cannot be in a residential district. End of story, no exceptions, no if, ands or buts you're done. We're back to the, you, the only thing you can maybe do is go through the general variance process and ask for a variance to the scheme. Is that facially discriminatory? Does it, if the ordinance says that, that if it only said, if it says the generic three unrelated people, that's it, then it's not facially discriminatory because it doesn't have the characteristics, but it still prevents your client. But we get back, we get to the same place because what they have done is they made housing unavailable. So your claim would be that that is Ray facially discriminatory too. No, we are that we would not say that that, see, that's what goes. It goes back to judge Marcus's point or question, which is if you have a scheme that is generally forbidding you from doing what you want to do, and you say that that is not facially discriminatory, then how can a scheme that generally prohibits you, but gives you an out be facially discriminatory? Facial facial discrimination is a subset of intentional discrimination. All right. We would argue that pro prohibiting more than three people in a zone that, that, that impacts disabled people constitutes intentional discrimination. Okay. Let me stop. So that position is based on numbers. Can a city pace? Cause I'm really interested in your ultimate theory. If a city says 10, is that facially discriminatory and intentionally discriminatory? No, it's not. Why not? Why is 10 different than three? Why? Because 10, some courts might say 10 is an accommodation and I would, I would talk. I'm not, I'm not asking you about accommodation. I'm just saying some courts might say that, but asking you in the, if, if, if, if, if the ordinance says up to 10 unrelated people can live in any zone and we wanted 12 and we asked her, you'd be making the same argument you're making today. You may not win on it, but you'd be making the same argument when you're discriminating because you are preventing us from having the number of people that we want for a disabled facility. No, we, it's a, it's a different analysis. You're on about six, six would be, it's still a different analysis. And where does, how does it come out? It depends. No, I'm going to give you the lawyer. You're you. No, no, no. I don't want a lawyer. Okay. Here you, you, you are making a facial discrimination claim. If so, three, you say is facially discriminatory. 10 you say is not facially discriminatory. It can be. Now I'm asking you about six, the state of Florida has, has established six for community residents, state licensed community residents. A lot of communities say six is, is a good number. If you want more than six, I'm not asking you whether communities do it or in the state allows it. I'm asking you what federal law prohibits it. So if you have, if you have a six limit, a six person unrelated limit requirement, Is that facially discriminatory under the ADA and FHA? If a sober house can operate with the problem here, let me, you have a sober, you have a sober living facility that has 12 rooms and they don't want to operate with just six because six rooms are unused and not enough income is coming into service, the debt and provide a profit and all that. So what facility that has 12 rooms says, you know what? Six is not enough. You've got to give me 12 and the facility has 15 says 12 is not enough. You've got to give me 15. So where does it stop? I want to know legally, statutorily where the line is and why. Okay. In the world of sober living, there needs to be a critical mass in order for the house to operate on a basis that ameliorates the effects of the disability. Three will not cut it. Six is probably the minimum that will cut it. 10 is probably a good number. Numbers between six and 15 are good numbers for sober living. In the normal scheme of things, in the normal scheme of things, if a community says we will allow you six and you want more than six, the community will then say, well, you're going to, unless the city is willing to say, fine, we'll give you eight without having to go through any process. But the community might say, if you want more than six, you're going to have to go through zoning. The same thing with 10. If you want 12, the city might say we'll give you 12. Then again, the city might say you're going to have to go through zoning. But the bottom line is, is what is the critical mass that will allow a sober living facility to or ameliorate the effects of the disability? And we know from. And it's that, and whatever number that is, whatever that critical mass is, anything below it is facially discriminatory. It, it, well, right. Judge, I don't want to, I don't want to confuse things here in terms of, in terms of, of my argument. Facial discriminatory is a term of art in not only in, in, in, in fair housing law, but employment law. And it means that it's, it's discriminatory based on the particular characteristics of that group. If it's just the three generic unrelated persons, I would argue to you. And I will say this straight up, that that is not facially discriminatory, but it may well be intentionally. It constitute intentional discrimination, which is, which is different from facially discriminatory. So. Yeah,  Paul, and we've taken you, I've taken you way beyond your time. So I thank you for your patience and for your answers. Thank you very much, Your Honor. Thank you both very much.